

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00188-CV

———————————————

IN THE INTEREST OF S.V., J.V., AND K.V., CHILDREN

---

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CV-22-04-272

---

Before Sudderth, C.J.; Birdwell and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

After a bench trial, the trial court terminated Father's and Mother's parental rights to their three children—Andrew, Brian, and Cathy—who, at the time of trial, were eleven, ten, and seven years old, respectively.[1] The trial court then appointed the Texas Department of Family and Protective Services (the Department) as the permanent managing conservator of all three children. Father appealed. Mother did not.

Regarding Father, the trial court found that terminating his parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). The trial court also found grounds for termination under Subsections 161.001(b)(1)(E) (engaging in dangerous conduct), (N) (constructively abandoning the children), and (O) (failing to comply with provisions of a court order). *See id.* § 161.001(b)(1)(E), (N), (O).

On appeal, Father raises three issues:

[(1)] The trial court abused its discretion by not allowing . . . Father additional time to complete the court-ordered services when there was approximately five months left until the already extended dismissal date.[2]

---

[1]We refer to the parents as "Father" and "Mother," and we use pseudonyms to identify the children and Father's associates. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]Within Father's first issue, he also argues that if error was not preserved, then trial counsel rendered ineffective assistance.

. . . .

[(2)] The record does not support termination under [S]ubsections (E), (N), or (O) in this case.

. . . .

[(3)] [The Department] failed to prove that termination of [Father's] parental rights was in the children's best interest.

We hold that (1) Father did not preserve the denial of a continuance for appellate review,[3] (2) the evidence was sufficient to support the trial court's finding that Father engaged in conduct that was dangerous to the children (the ground under Subsection (E)), and (3) the evidence was sufficient to support the trial court's finding that termination was in the children's best interest. Because we hold that the evidence was sufficient to support the ground under Subsection (E), we do not have to address whether the evidence was sufficient under Subsections (N) and (O). *See* Tex. R. App. P. 47.1; *In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at *2 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.). We overrule all three issues and affirm the trial court's judgment.

---

[3]And to the extent that Father asserts that trial counsel rendered ineffective assistance by not preserving his first issue, we hold that the record does not support Father's complaint.

3

# I.  EVIDENCE

## A.  The Investigator

### 1.  Before February 2022

The Department investigator, Susan Cumpton, said that she was aware that Father had a CPS history in Texas dating back to 2019.  Cumpton said that the previous case involved allegations of drug use and that a court had ordered Father to participate in services, but he did not.  Cumpton related that the Department had found reason to believe for neglectful supervision twice—once in early 2020 and once eight months later that same year, but on the latter occasion, she asserted that the Department had ruled out an allegation of physical neglect.

### 2.  February 9, 2022

Cumpton went to Father's house on February 9, 2022, after he had gotten out of jail.  Cumpton said that when she went to Father's house, she told him that the children had made an outcry that he was drinking to excess and passing out.  According to Cumpton, Father refused to take a drug test, refused to let her come inside his house, and refused to talk to her.

Cumpton was able, however, to observe the area outside the house, which she described as unsafe for children.  She explained that the yard was filled with broken-down cars and kitchen appliances, like refrigerators and stoves.  She said that the weeds stood two to three feet tall.

In contrast to the condition of the yard, Cumpton noticed that every corner of Father's house had a very advanced security-system camera. Cumpton explained that, based on her experience, the security system suggested that Father might be selling drugs from the house.

### 3. April 8, 2022

Cumpton returned to Father's house on April 8, 2022. This time she came with an order to have Father drug tested.

This time she also went with sheriff's deputies because she was concerned for her safety. Cumpton said that during all these investigations, Father was described as being uncooperative and aggressive. When asked why she was afraid, she responded, "Because [Father] has never participated in a calm[,] safe manner. It's always been in an aggressive manner towards any investigators. It's documented throughout every case."

Cumpton said that Father was again not cooperative, but the children's grandfather was; it was the grandfather who let Cumpton into the house. The inside, Cumpton said, was like two homes. On the one side, the house was very clean; the children's grandparents lived on that side of the house. The other side was filthy with trash everywhere; Cumpton said that Father's room was so dirty that she could not see the floor because it was littered with rotting food and trash. Throughout the kitchen and Father's room were empty liquor bottles. She said, "There [were] beer cans all over the place, empty whiskey bottles outside, inside, in the kitchen . . . . I

5

probably stopped counting at like [twelve] or [thirteen]." The children all shared one room, which she described as not very clean.

Cumpton said the children's grandfather told her that Father was back in his room. The grandfather knocked on Father's door for about twenty minutes, but Father never answered. The deputies then knocked on the door, and about ten or twenty minutes later, Father's girlfriend, Hailey, answered the door. Hailey told them that Father was not there because he had gone to court. When Cumpton responded that she did not believe Hailey, Hailey denied knowing where Father was. The sheriff's deputies searched the house, and one of the officers found Father in either a laundry room or a bathroom hiding under a sheet.

While there, the officers arrested Hailey for possession of heroin and a parole violation. And while there, the children's grandparents informed Cumpton that they were about to return to Florida.

Cumpton said that the environment was very unsafe for the children. When asked how the environment was dangerous, Cumpton responded, "Well, the alcohol bottles alone left out to children were concerning. The mold inside the home was concerning for them for breathing, feeding. Just generally the place was not a healthy environment for them."

Cumpton said that she had an opportunity to review the court's service plan with Father and that he did not ask her any questions. To her knowledge, he had not completed any of the services. Cumpton said that she set up a drug test for Father,

but he did not take it, so she set up a second drug test for him, but he did not take that test either.

### 4. April 14, 2022

Cumpton made a follow-up appointment for April 14, 2022, to visit Father's home and inspect it while the children were still there. The children were healthy, but Father was not present, although the children's grandfather was. Cumpton said that while she was standing outside, Father drove up in his car, but when he saw her, he put the car in reverse and then took off. Cumpton said that she made several attempts to call Father, but most of her calls just went to voice mail. When Father eventually answered, Cumpton said that he slurred his words so badly that she could not understand anything that he was trying to say.

### 5. April 18, 2022

Cumpton related that when the case was later staffed, her supervisor stated that because of an inability to address their concerns about Father, i.e., his drug and alcohol use, the Department needed to remove the children.[4] The trial court signed an order for protection on April 18, 2022.

---

[4]Cumpton never articulated how, if at all, the grandparents' presence in the home factored into the decision not to remove the children earlier. However, the grandparents' warnings that they were leaving for Florida would have been an obvious catalyst motivating the removal.

7

### 6. The Investigator's Summation

When asked at trial why Father presented a danger to the children, Cumpton responded,[5]

> A. He can be irrational. . . . [T]hroughout this case he hasn't even appeared to engage with his children. I don't know if he would put their needs before his own.
>
> Q. Could that be seen in the fact that his home and his yard were littered with alcohol, empty alcohol beverage containers?
>
> A. Yes, ma'am. And the children stated their concerns for him.
>
> Q. And obviously someone who is intoxicated would not be able to properly supervise children; is that correct?
>
> A. That's correct.
>
> Q. Was it to the level that it appeared that he was using alcohol?
>
> A. That's correct.
>
> Q. Is it the Department's position that his parental rights should be terminated?
>
> A. That's correct.

Elaborating, Cumpton said that the children had expressed concerns about Father: "[They said that Father] drinks to excess[,] and he passes out. They don't know if he's alive or dead. I mean they are concerned he won't wake up." According to Cumpton, the children said that Father drank to excess every day. The children knew that Father drank whiskey, but they did not know which kind.

---

[5]In his brief, Father complains that the testimony was conclusory. Because of this concern, we quote rather than summarize certain portions of the testimony.

Regarding how the children managed while in Father's care, Cumpton said that they learned to take care of themselves. She said, "They talked about cooking for themselves. They talked about making sure each other got up for school. They were each other's . . . support system . . . ."

## B. The Caseworker

The Department caseworker, Miranda Daugherty, had the case since the trial court entered temporary orders in late April 2022.

### 1. Mother

Daugherty contacted Mother. Mother's description of her relationship with Father raised concerns:

> [Mother] said it was an unhealthy relationship. She said that [Father] cheated on her frequently and at times would be aggressive in her vicinity. Like he would hit the wall or a chair when he was mad at her. And she said that one time when she was pregnant that he had actually opened the door and like hit her in the belly with the door handle.

### 2. The Home

Daugherty said that initially the children's grandparents were living in the house, but they moved to Florida shortly after the case began. Father's girlfriend, Hailey, lived there too, but she moved out as well. Beyond that, Daugherty could not say who was living there.

Daugherty said that before the children's grandparents moved to Florida, she was let into the house; after the grandparents moved, Father did not let her into the house. Daugherty said that the front three rooms were clean, but the others had

9

garbage stacked on the floor.  She described the outside as having "multiple cars without license plates in varying levels of being taken apart.  There [were] taken[-]apart hot tubs, lawnmowers, [and] appliances[] just left out and around on the ground.  The grass was always overgrown.  It was just hazardous . . . ."

### 3.  Father's Criminal History

Daugherty was aware that while Father lived in Kansas, he had several DWIs and eventually had his driver's license revoked due to the DWIs.  While in Texas, Father had one arrest for public intoxication and other arrests not related to alcohol.

### 4.  Concerns about Father

According to the children, Father drank excessively.  One of the children asserted that Father also used drugs but could not identify which drugs.

Daugherty expressed the Department's concerns as follows:

> There were concerns for his mental health and his mental stability.  There were concerns for domestic violence.  There were concerns for his ability to care for the children financially.  There were concerns with the home not being in a safe condition.  There were concerns that there were friends of [Father] with criminal histor[ies] that were residing in the home.  His girlfriend, [Hailey], for example, had [a] criminal history[,] and she was residing there with him.  And then the concern of hi[s] participating in criminal activities himself.

Daugherty explained the risks associated with criminal activities: "He puts them at risk by exposing them to potential violence, potential substances.  He puts them at risk for being left unattended if he were to be arrested while being the sole caregiver for the children."

Daugherty continued to address the Department's various concerns:

Q. And what about alcohol use?

A. There is a concern of his alcohol use that he would not be able to properly supervise the children or to ensure that they were receiving all the care that they needed.

Q. And domestic violence?

A. There is a concern with the domestic violence. Both with his more recent relationship with [Christy, a former girlfriend,] as well as his previous relationship with [Mother]. The concern is that he is exposing violence around the children and putting them at risk for being caught [between] him and her and being involved in the violence.

Q. So did you say that there is a risk for physical harm?

A. Yes.

Q. What about emotional damage? Could the child[ren] suffer emotional damage when they are exposed?

A. Yes, they did.

Q. How is that?

A. Children who grow up in domestic violence households . . . often suffer from traumatic experiences witnessing your parent hurting someone else that you care about in your home. It's traumatic. It makes them feel unsafe[,] and it impacts their ability to create a lasting bond in a relationship.

Q. Is that essential to a loss of trust?

A. Yes.

Q. And does the Department believe that if the children were returned to him[,] they would continue to be exposed to that kind of behavior and that kind of environment?

A. Yes.

Q. Is that based on the long history that we discovered that [Father] has?

A. Yes.

Daugherty elaborated that while the case was pending, Father failed to alleviate

the Department's concerns:

> He has failed to demonstrate that he could care for the children. He has failed to demonstrate that he can interact well with the children because he has not attended his visitation. He has failed to demonstrate that he can be sober and maintain that sobriety while caring for the children. He has failed to demonstrate that his home can be a safe and stable environment for the children.

Daugherty affirmed that Father had not done anything on his service plan in the three

months before trial.

Daugherty opined that giving Father more time would not change the situation:

Q. And is it safe to say that by not doing what he's supposed to do he has shown that he is not . . . going to change anything. If he can't change during the course of a case when he doesn't have his kids[,] do you expect him to change after if he was given more time?

A. I do not anticipate him making any of those changes.

Q. . . . [H]e hasn't done it yet; correct?

A. Correct.

Regarding the children's current status, Daugherty said that they had been

placed together in a home that was open to adoption:

Q. Are they in an adoptive placement?

12

A. It is an adoptive foster home.

Q. Are they adoption motivated at this point even though it's only been [three] months?

A. Pretty much.  I think they are still trying to feel it out.

Q. What have you told the older children about what they want to do?

. . . .

A. The older [two] want to stay there.  [Cathy], she still wants to come home with her dad[,] but she knows it's not safe.  And the parents are still feeling it out.

## C.  Father

### 1.  Visited Children Rarely

Father admitted that despite having the opportunity to visit his children on a weekly basis, he had seen them only twice in the past twelve months.

### 2.  Provided No Financial Support; Sent No Cards or Gifts

Father admitted that while the children were in the Department's care, he provided no money to help support them.  He denied knowing that giving the children cards or gifts for the holidays was an option.

### 3.  Failed to Show Up for Court

When asked why he had not shown up for court hearings in the past year, Father responded, "I didn't know I had court."  He also explained that he had been very spiteful and depressed, so he "didn't do anything for at least the first [six], [seven], [or eight] months."  Despite being depressed, he did not seek help.

### 4. Failed to Work Services

Father admitted that he had been given a court order telling him what he needed to do to get his children back. The caseworker went over the order with him. He also admitted not following that order.

### 5. Multiple Arrests; Jailed at Time of Trial

Father conceded that at the time of trial, he was in jail for violating a protective order. Father was not sure how many times he had been arrested in the past year, but he knew it was at least three times. He was arrested for possession of a controlled substance in October 2022. And in January 2023, he was arrested for bodily-injury assault with family violence. In February 2023, he was arrested for aggravated assault with a weapon and for interfering with an emergency call. While in jail, he was also charged with continuous violence against a family member. Then in March 2023, he was arrested for violating a protective order. Father said that he had been arrested twice for violating a protective order—once when the person who was the subject of the protective order was giving him a ride to his lawyer's office, and once when he was home alone. Regarding the arrest at home, Father explained that he was ordered not to come within 500 feet of his house.

Father acknowledged that his former girlfriend, Christy, was the alleged victim in all these offenses. Father maintained that Christy had punched him in the face and broken his grandfather clock, and her actions somehow resulted in his January or February 2023 arrest. Father maintained that that was the first time that he and

Christy had gotten into a physical altercation. Father denied striking her or any other woman.

### 6. The Children, Mother, Child Support, and Possession

Father conceded that he was ordered to pay child support to Mother but never paid any because he had the children.[6] He further acknowledged that despite having the children, he never went to the trial court to change the child-support orders.

### 7. Father's Finances

Father said that he was self-employed, owned his own home, and paid his own bills. When asked what he did, he responded, "I fix stuff." He explained that he worked as a plumber, an electrician, and an auto mechanic. He typically worked fifteen to twenty hours a week and made $300 to $400 per week. Father said that he moved into his house in 2015 and had it paid off by 2018.

Father did not have a vehicle. He said Christy "blew it up." Father maintained that he would use his tax refund to help purchase another vehicle.

### 8. Father's Future Plans

Father asked for an opportunity to get his children back. He denied previously being given an opportunity. He cited his long stretch of depression during the first seven months and, more recently, his incarceration to support his assertion that he had not previously been given an opportunity.

---

[6]Father explained that after the court proceedings with Mother concluded, she had the children for four to six weeks before she left them with him.

15

Father maintained that he had quit drinking and had also cleaned up his house and the yard. Father said that he had also talked to his sister about her watching the children in his absence. His sister, he asserted, lived only about twenty minutes from his house.

Father acknowledged that he could not take possession of the children immediately after the trial because he was in jail. Father explained that his primary concern was his "legal stuff." He stated that he thought he would bond out the week after trial, but he conceded that he "[did]n't actually have a really good reason to say that."

## D. CASA

The court-appointed special advocate (CASA),[7] Kris Tamplen, testified that the children loved Father. On the other hand, Tamplen said that the children seemed to recognize that he could not provide them a stable home: "Like [Andrew] has told me that he loves his dad but he does not deserve to go back. [Brian] has just said he is very happy where he is. And [Cathy] loves where she is but misses her dad."

## II. ISSUES

### A. Continuance

In Father's first issue, he contends that the trial court should have granted him a continuance so that he could work his services. On April 12, 2023, the trial court

---

[7]*In re L.T.*, No. 02-22-00197-CV, 2022 WL 15053329, at *2 (Tex. App.—Fort Worth Oct. 27, 2022, no pet.) (mem. op.).

signed an order extending the dismissal date to October 20, 2023. The trial was in May 2023. Father contends that he should have been allowed to use the additional time.

Father's counsel did not move for a continuance. To the extent that Father's pro se request at trial for additional time constituted a motion for continuance, Father was not entitled to hybrid representation, and the trial court did not have to rule on any pro se request. *See In re Z.D.R.R.*, No. 05-23-00094-CV, 2023 WL 2259151, at *1 n.1 (Tex. App.—Dallas Feb. 28, 2023, no pet.) (mem. op.); *In re H.O.*, 555 S.W.3d 245, 247 n.1 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).[8]

In the alternative, if this issue was not preserved, Father asserts that his trial counsel rendered ineffective assistance. We disagree.

To establish ineffective assistance, Father must show both (1) that his trial counsel's performance was deficient and (2) that his trial counsel's deficient performance prejudiced his case. *In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *8 (Tex. App.—Fort Worth Oct. 21, 2021, pets. denied) (mem. op.). Father can do neither.

An ineffective-assistance-of-counsel allegation in a termination proceeding must be firmly founded in the record, and the record must affirmatively show the

---

[8]*H.O.* does not identify itself as an opinion on motion for rehearing. 555 S.W.3d at 246. It issued, however, after the father—who was represented by counsel—filed a pro se motion for rehearing, *id.* at 247 n.1, and after the court had withdrawn its earlier opinion, *id.* at 246–47.

alleged ineffectiveness and the resulting harm. *Id.* at *9. When the record is silent regarding counsel's reasons for doing or not doing something, we may not speculate to find that trial counsel was ineffective. *Id.* Only when the conduct was so outrageous that no competent attorney would have engaged in it can we conclude that the challenged conduct constituted ineffective assistance. *Id.* at *8.

Here, the record does not contain trial counsel's explanations regarding why he did not move for a continuance. And given the fact that at the time of trial, Father had not worked services, was incarcerated, and would remain incarcerated for an unknown length of time, we cannot conclude that counsel's failure to move for a continuance was conduct so outrageous that no competent attorney would have engaged in it. *See id.* at *8–9.

Additionally, the record does not show any harm caused by trial counsel's failure to move for a continuance. Promises of change if given the chance, while undoubtedly well intentioned, provide no assurance of the children's future well-being. *In re G.A.B.*, No. 09-22-00062-CV, 2022 WL 3452272, at *5 (Tex. App.— Beaumont Aug. 18, 2022, no pet.) (mem. op.) (citing *In re A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied)). Father had not participated in services to prevent his children's removal, and twelve months after their removal, he still had not participated in any services to earn them back. Assuming Father made improvements, relatively recent improvements in lifestyle do not necessarily negate a criminal history, drug use, or violent behavior. *Id.* (citing *In re J.F.-G.*, 627 S.W.3d 304, 316–17 (Tex.

2021)). Father's conduct both before and after the removal rendered any short-lived improvements immaterial.

We overrule Father's first issue.

## B. Sufficiency

Father attacks the legal and factual sufficiency of the evidence supporting both the best-interest finding and the grounds findings.

### 1. Legal Requirements

To terminate a parent–child relationship, the Department must prove by clear and convincing evidence that the parent's actions satisfy at least one statutory predicate ground listed in Family Code Section 161.001(b)(1) and that termination is in the child's best interest under Texas Family Code Section 161.001(b)(2). Tex. Fam. Code Ann. §§ 161.001(b)(1), (2), 161.206(a), (a-1); *J.F.-G.*, 627 S.W.3d at 312; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

### 2. Standard of Review

When reviewing the sufficiency of evidence supporting termination findings, we must determine whether a reasonable factfinder could have formed a firm belief or conviction that the challenged findings were true. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Both legal and factual sufficiency turn on this question; the distinction between the two analyses "lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

19

In our legal sufficiency analysis, we view the evidence "in the light most favorable to the finding," assuming that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so and disregarding all evidence that a reasonable factfinder could have disbelieved. *Z.N.*, 602 S.W.3d at 545; *see A.C.*, 560 S.W.3d at 630–31.

"Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding" to determine if "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review.").

The two sufficiency determinations overlap in many respects; if the evidence is factually sufficient, it is necessarily legally sufficient. *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.). Because Father challenges both legal and factual sufficiency, we will conduct a consolidated review.

### 3. Grounds: Conduct-Based Endangerment

Father challenges the legal and factual sufficiency of the trial court's conduct-based endangerment finding under Subsection (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

#### a. The Law on Conduct-Based Endangerment

A predicate finding under Subsection (E) supports termination if the trial court concludes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct [that] endanger[ed] the physical or emotional well-being of the child." *Id.* Subsection (E) requires a voluntary, deliberate, and conscious course of conduct rather than a single act or omission. *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *9 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.). The evidence of a parent's endangering course of conduct is not limited to actions directed toward the child; indeed, the trial court may consider actions before the child's birth and actions while the child is not in the parent's presence because all such actions may create an inference that similar conduct could recur and jeopardize a child's well-being. *Id.*; *see J.O.A.*, 283 S.W.3d at 345.

#### b. Discussion

The evidence showed that Father drank to excess to the point that he passed out and that his children feared he would not wake up. The children expressed concern because Father's excessive drinking happened every day. Father maintained that he had given up drinking, but the trial court, as the factfinder, did not have to

21

believe him. The trial court was the sole judge of the witnesses' credibility and was free to believe or disbelieve the various witnesses' testimony. *In re J.B.*, No. 02-21-00239-CV, 2021 WL 6144074, at *23 (Tex. App.—Fort Worth Dec. 30, 2021, pet. denied) (mem. op.).

The question of whether Father used drugs was never definitively resolved. When the Department asked Father to take drug tests, he refused. His refusal, however, did not preclude a finding that Father used drugs. In a civil proceeding, a rational factfinder could have reasonably concluded that Father refused to take drug tests because he knew that the results would come back positive. *See Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558 (1976); *Gebhardt v. Gallardo*, 891 S.W.2d 327, 331 (Tex. App.—San Antonio 1995, orig. proceeding). One of the children asserted that Father used drugs. A rational factfinder could have reasonably concluded that Father's refusal to take drug tests reinforced the conclusion that Father was using drugs and was trying to avoid detection.

One of Father's live-in girlfriends—Hailey—was arrested for possession of heroin while in Father's house. A rational factfinder could have reasonably concluded that—through Father and other sources as well—both drugs and drug users were finding their way into the children's home.

Evidence showed that Father could become angry and act violently. Mother mentioned to Daugherty how Father would punch walls when he was angry and how he once opened a door, causing the handle to hit her stomach while she was pregnant.

Father denied striking any woman, but he admitted that Christy struck him and broke his grandfather clock. Thus, at the very least, according to Father, one of his girlfriends was violent. Contrary to Father's account, the police arrested him for family violence, and the trial court issued a protective order in Christy's favor against Father. A rational factfinder could have reasonably concluded that violence was present in Father's home and that sometimes people had been injured and at other times objects had been broken because of that violence.

### c. Holdings and Ruling

Accordingly, we hold that the evidence was both legally and factually sufficient to show that Father engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002).

Regarding the trial court's findings on (N) and (O) grounds, "'[t]o affirm a termination judgment on appeal, a court need uphold only one [predicate] termination ground' plus the best interest finding." *A.N.*, 2022 WL 2071966, at *2 (quoting *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019)); *see In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022). Because only one ground is necessary, and because Father's attack on ground (E) has failed, we need not address his attacks on the (N) and (O) grounds. *See A.N.*, 2022 WL 2071966, at *2; *see also M.P.*, 639 S.W.3d at 702.

We overrule Father's second issue.

## 4. Best Interest

### a. Legal Principles

Although courts generally presume that keeping children with a parent is in the children's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered and focuses on the children's well-being, safety, and development, *A.C.*, 560 S.W.3d at 631. In determining whether evidence is sufficient to support a best-interest finding, courts review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence that is probative of a Subsection (b)(1) ground may be probative in determining the children's best interest. *Id.* at 249; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). Courts also consider a number of nonexclusive factors when determining the children's best interest:

- the children's desires;

- the children's emotional and physical needs now and in the future;

- the emotional and physical danger to the children now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the children's best interest;

- the plans for the children by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

24

- the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

- any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*; *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *15 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.).

### b. Discussion

#### i. The Children's Desires

The children loved Father, but they also understood that he was incapable of providing them a safe and secure home.

#### ii. The Children's Emotional and Physical Needs Now and in the Future

Father was in jail. He could not provide for the children's current needs. How long Father would remain in jail—or prison—was unknown. Even if Father were released, a rational factfinder could have reasonably concluded that Father had not

addressed any of the concerns that led to the children's removal in the first place. Father thus could not provide for the children's needs in the future.

In contrast, the children were placed in a home with the prospect of being adopted. "[S]tability and permanence are paramount considerations in evaluating the needs of a child." *S.B. v. Tex. Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 255 (Tex. App.—Austin 2022, pets. denied).

### iii. The Emotional and Physical Danger to the Children Now and in the Future

According to the testimony, Father's future—assuming that he did not remain in jail or go to prison—posed both emotional and physical dangers to the children.

For example, Father was prone to violent outbursts; he had been arrested for family violence. At least one of Father's girlfriends had, according to Father, engaged in violence. Consequently, regardless of its source, the children would likely be exposed to family violence.

Additionally, Father used alcohol to excess. The children feared for his well-being, and others feared for the children because Father routinely drank to the point of incapacitation.

The evidence supported the conclusion that Father used drugs. One of Father's live-in girlfriends was arrested for possession at the children's home. Thus, the evidence showed that the children were exposed to drugs and to people who used drugs when living with Father.

### iv. The Parental Abilities of the Individuals Seeking Custody

Before the removal, Father was not parenting the children. The children were effectively parenting themselves. A rational factfinder could have reasonably concluded that Father was not a viable custody option.

### v. The Programs Available to Assist These Individuals to Promote the Children's Best Interest

Father did not work services. The evidence showed that Father would not avail himself of services to promote the children's best interest.

### vi. The Plans for the Children by These Individuals or by the Agency Seeking Custody

Because Father was in jail, he had to rely on the Department to care for the children. While the children were in the Department's care, Father provided no financial and precious little emotional support—he had visited them only twice in the past year.

In contrast, the Department hoped that the current placement would result in the children's adoption. A prerequisite to a valid adoption is termination of the birth father's and birth mother's parental rights. *In re C.W.*, No. 02-21-00252-CV, 2022 WL 123221, at *11 (Tex. App.—Fort Worth Jan. 13, 2022, no pet.) (mem. op.). Absent termination, the children would remain in a conservatorship limbo. *See id.*

### vii. The Stability of the Home or Proposed Placement

Father could not offer any stability. He was incarcerated at the time of trial, and he could not say how long he would remain confined.

27

On the other hand, the testimony showed that the children were happy in their current placement and that their needs were being met. Additionally, the current placement was adoption motivated.

### viii. The Parent's Acts or Omissions Indicating that the Existing Parent–Child Relationship is Not a Proper One

While the children lived with Father, he incapacitated himself daily with alcohol. The children were effectively left to fend for themselves. Complicating the children's home life was the presence of Father's girlfriends, who either used drugs or engaged in violence. Father went to see the children only twice while they were in the Department's custody. Based on the evidence, a rational factfinder could have reasonably concluded that the existing parent–child relationship was not a proper one.

### ix. Any Excuse for the Parent's Acts or Omissions

Father blamed his failure to work services and to visit the children on his depression, for which he sought no help, and, later, on his incarceration. Regardless of the explanation, Father had over a year to rectify the situation and create a safe and stable home for the children. The evidence showed that during that time, Father did at best very little and at worst nothing toward that goal.

### C. Holdings and Ruling

Accordingly, we hold that the evidence was both legally and factually sufficient to show that termination of Father's parental rights was in the children's best interest.

*See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.F.C.*, 96 S.W.3d at 265–66 (citing *C.H.*, 89 S.W.3d at 25).

We overrule Father's third issue.

### III. CONCLUSION

Having overruled Father's three issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered:  September 14, 2023